IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION


BARBARA J. GRAU      )     CASE NO. 4:13-cv-154 JEG-TJS
              )
              )
    PLAINTIFF,   )
              )     REPORT AND RECOMMENDATION
      VS.      )
              )
CAROLYN COLVIN,    )
ACTING COMMISSIONER  )
OF SOCIAL SECURITY,   )
              )
    DEFENDANT.  )
_____


    This case has been referred to the undersigned U.S. Magistrate Judge, Recall

Status, for purposes of Report and Recommendation pursuant to 28 U.S.C. 636(a)(1) on

Plaintiff Barbara J. Grau's Complaint (Clerk's No. 1), seeking reversal of the

Commissioner's decision denying her application for Supplemental Security Benefits under

Title XVI of the Social Security Act, 42 U.S.C. 1381, et seq.

    This Court's review of the Commissioner's final decision, including this

Report and Recommendation, is done pursuant to 42. U.S.C. 405(g), 1383(c)(3).

# I. PROCEDURAL AND FACTUAL BACKGROUND

Grau protectively filed an application for disabilty and disability insurance on June 18, 2010, alleging that she became disabled on March 31, 2008. That claim was initially denied on January 15, 2010, and  was again denied upon reconsideration on April 15, 2010.

On May 6, 2010, Grau  filed a written request for hearing on her claims pursuant to 20 CFR 404.929 *et seq*. That request was granted by Administrative Law Judge (ALJ), Tom L. Morris who conducted a hearing on September 20, 2011. Grau appeared with her lawyer Thomas A. Krause. At that hearing Holt testified on her own behalf, as did the impartial vocational expert (VE) Carma A. Mitchell.

On November 4, 2011, ALJ Morris  denied Grau's application for disability insurance benefits, finding Grau was not disabled. Thereafter, she asked the Appeals Council to review the denial of her claim. The Appeals Council denied her  request for review on January 25, 2013. Grau  filed her complaint in this Court on April 3, 2013, pursuant to 42 U.S.C. 405(g) and  1383(c)(3).

Grau was born on March 21, 1955; she was 54 years old on the date that she was last insured, and was defined as of that date as an individual closely approaching advanced age (20 CFR 404.1563).

## II. FINDINGS OF THE COMMISSIONER

In the decision filed November 4, 2011, the ALJ found, int*er alia:*

1. Grau met the insured status requirements of the Social Security Act through September 30, 2009.

2. Grau had not engaged in substantial gainful activitiy from her alleged onset date of March 31, 2008, through her date last insured of September 30, 2009. 20 CFR 404 1571 et seq.

3. Grau had through September 30, 2009, had severe physical impairments consisting of fibromyalgia and enlarged right sternocleidomastoid. 20 CFR 1404.1520 (c).

The ALJ found that the medical evidence established these impairments were "severe" within the meaning of the Regulations because they caused significant limitations in Grau's ability to do basic work related activities. He noted also that the medical evidence showed that Grau had been treated for plantar fasciitis and right deQuervain's tenosynovitis with injections and a Medrol Dosepak with reported improvement. However, the ALJ also found that objective evidence failed to document significant functional limitations due to the conditions, leading him to find that the impairments were not severe in nature.

4. The ALJ found that through September 30, 2009, Grau did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. 20 CFR 404.1520 (d), 404.1525 and 404. 1526.

In considering all of Grau's impairments individually and in combination the ALJ found no evidence that the combined clinical findings from those impairments reached the level of severity contemplated in the Listings. Grau did not show evidence of an impairment which meets or equals the criteria of a listed impairment or of a combination of impairments equivalent in severity to a listed impairment. He found that disability could not be established on the medical facts alone. 20 CFR 404. 1520 (d). Because Grau's representative, in the brief submitted prior to the hearing, failed to indicate specific medical findings in the record, which would support Grau's allegation she should be considered disabled under listing 14.06 the ALJ rejected that argument. In reviewing listing 14. 06 the ALJ determined that the medical evidence did not document weight loss or consistent signs of severe fatigue, fever or malaise As required by the listing and the medical record did not support listing level signs and symptoms with respect **to** limitation of activities of daily living, social functioning, or Consistent deficiencies in concentration, persistence, or pace during the relevant period. The ALJ found that evaluations by various specialists resulted in negative of objective findings and no

diagnoses of connective tissue disease within the relevant period. Specifically Dr. Braun, the treating rheumatologist stated that Grau may have a mild undifferentiated connective tissue disease. He found however that she did not meet the criteria for any autoimmune disorder.

5. The ALJ found, after consideration of the entire record, that Grau through September 30, 2009, had the residual functional capacity to perform sedentary work as defined in 20 CFR 404. 1567 (a) with specific additional limitations: alternate stand/sit as needed, remaining on task; walk no more than thirty minutes; and no more than one hour continuous typing. It was noted by the ALJ that he considered all symptoms, and the extent to which those symptoms can be reasonably accepted with the objective medical evidence and other evidence, in accordance with 20 CFR 404. 1529, as well as SSRs 96 – 4p and 96 – 7p.

Significantly the ALJ determined that the objective findings in Grau's case failed to provide strong support for her allegations of incapacitating symptoms and limitations. He noted that the medical findings do not support the existence of limitations greater than the listed residual functional capacity. Limiting his analysis to the relevant time period from March 31, 2008, through September 30, 2009, revealed that Grau had carried a diagnosis of fibromyalgia during the relevant period. He noted that Grau testified she was diagnosed in 1991, but records were not available because the treating doctor had retired.

The ALJ noted that Grau had followed up with her rheumatologist, Alan Braun, M. D. on January 22, 2008 and reported some upper and lower back pain as her main problem but not much different from earlier visits; she was sleeping well. Her fibromyalgia and osteoarthritis were described as stable with could control on medications. He recommended no changes in her treatment. Grau was examined in May 2008, by her family physician Dr. Overton – Keary, complaining of right sided throat swelling which an MRI of the neck revealed as an enlargement of the right sternocleidomastoid muscle as well as some neuro-foraminal stenosis at C 3 – 4. At that time Dr. Overton – Keary noted Grau was a vague historian and that no neurologic abnormalities were found on examination. Grau was then referred to Dr. Paulson, an otolaryngologist who on July 25, 2008 also found a negative examination and and unknown cause for what he described as a " confusing set of symptoms".

The ALJ found that Grauel's neurological exams were consistently entirely normal. In April 2008 an MRI of the brain was normal. The ALJ specifically commented upon an October 2008 visit Grauel had with Dr. Overton – Keary during which Grau presented to Dr. Overton – Keary a four-page singlespaced document of her then current symptoms and problems and in which Grauel stated that the diagnosis of fibromyalgia was incorrect because her problems were mostly limited to her right shoulder and neck, based on what she had been told by her chiropractor, physical therapist and personal trainer. An additional follow-up examination with Dr. Paul Babikian, a neurologist, on June 2, 2009, reflected negative neurological exams.

Subsequently Dr. Overton – Keary noted multiple somatic complaints in January 2009, and suspected a somatoform disorder or stress-related symptoms. Grau was again evaluated by Dr. Braun on April 8, 2009, for follow – up of facial rashes and fibromyalgia. At that time she continued to have diffuse myalgias; a skin biopsy was negative for lupus. She was reassured she did not have an autoimmune disease. On April 13, 2009 Grau reported improvement as a result of taking a medication. During a June 8, 2009 visit with Dr. Braun Grau reported doing better and Dr. Braun noted clear – cut fibromyalgia improvement. He also stated that it was possible that Grau may have a mild undifferentiated connective tissue disease, but she had never met the criteria for any autoimmune disorder.

Grau's medical records subsequent to September 30, 2009 reflected continued medical managements with good results including a course of Prednisone. Her medical records also indicated that fibromyalgia and an undifferentiated connective tissue disease were considered well controlled with minimal symptoms and some level of somatization. An examination in October 2010 showed no swelling or stiffness, no evidence of lupus, Raynaud's or Sjogren's like symptoms. Recent testing for lyme's disease were negative in February 2011. Treatment records did not document any clinical findings of additional impairments or worsening symptoms.

In March 2008 Grauel was evaluated for chest pain and found to have a normal coronary CT angiogram as well as a borderline normal electrocardiogram ( ECG). Her chest pain was considered to be non-cardiac in nature. By October 2010 Grau reported feeling 100% better

after being placed on medications; she was able to do many things she could not do before.

In May 2011, during a cardiac follow-up appointment Grau reported episodes of chest discomfort, lightheadedness, and mild lower extremity edema. At that time she was convinced she had Lyme disease that no one could diagnose even though previous laboratory testing was negative. Additionally she had stopped taking numerous mild medications on her own in March 2011 without an increase in symptoms. At that time she reported aerobic exercise, lifting weights and walking her dog. She reported weight gain. At that time she was described as being overweight at 178 pounds and a height of 65 inches. At that time the cardiologist concluded Grau was doing well from a cardiac standpoint and that her alleged symptoms were non-–cardiac in nature.

The ALJ considering all the foregoing summarized evidence found that Grau's medically determinable  impairments could reasonably be expected to cause the alleged symptoms; however her statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible to the extent they were inconsistent with the residual functional capacity assessment. He noted also that "at one point or another in the record, either in forms completed in connection with the application, in medical records or other statements, Grauel reported activities of daily living including caring for her dog, walking at least 9 blocks; preparing simple meals; providing child care for, and transporting,

her grandson to and from school daily; dishes; laundry; shopping; running errands; housecleaning tasks including vacuuming; mowing the lawn and washing her car. Grauel reported doing these activities one to 3 hours per day, including vacuuming for one hour of time. The ALJ also noted that Grau completed a college degree sometime after the alleged onset date he also pointed out that the record contained conflicting statements which eroded Grau's credibility:

by May 2008 she stated her condition worsened and she ended by being bedridden for an extended period; she reported she was too sick to go to the doctor is the reason that no medical records were available for that period; however she also testified that her son lived in the area but she did not request his assistance for her to seek medical attention; he also noted that Grau testified that she was very sick during the first 3 months of each year and that was the reason her income tax returns were filed late; but Grauel reported full-time child care until May 2008, and she continued to care for her grandson daily from around the alleged onset date and following; and while she reported periods of being so sick that she was unable to drive herself to the doctor, she maintained that she supervised her grandson daily throughout that pertinent including driving him to and from school each day.

The ALJ specifically focused on Grau's claims that she had very limited use of her hands and as a result was forced to alternate using one hand at the time to use a computer keyboard. Despite those claims, he noted that Grau initially submitted several lengthy documents of single-spaced type describing her symptoms and treatments and in those documents she reported using

a traction device and washing her hair 3 times a day to alleviate itching. These were found to be reflective of a higher level of functioning than alleged.

It was also found that Grau stated she provided child care for her grandson from May 2008, until June 2011 when his family moved from the area. That work activity was not found to represent substantial gainful activity at step one of the sequential evaluation, and that work activity was an indication of involvement in a range of daily activity not consistent with disability from all work and was also found to represent a higher level of physical and mental ability than alleged. The ALJ stated that he found the record to reveal that Grau's alleged disabling impairments were present at approximately the same level of severity prior to the alleged onset date. He noted further that those impairments did not prevent Grau from working at that time and strongly suggests It would not currently prevent her from working.

Consequently the ALJ found that Grau's allegations of disability from all work are neither entirely credible nor supported by the objective medical evidence. Despite her allegations of significantly severe symptoms and limitations, office visits to doctors were fairly infrequent and Grau has not required emergency care or hospitalization for the alleged impairments. In addition, it was noted that her multiple somatic complaints and behavior were noted by various medical providers.

The ALJ, after reviewing Grau's medical records, specifically pointed out that notwith-standing her allegations of total disabling symptoms, and expecting to find indications in the treating records restrictions being placed upon Grau by the treating doctors, a review of the record

revealed no restrictions being recommended for Grauel by any treating physicians. Consequently in accordance with Social Security Ruling 96 – 6P, consideration of the administrative findings of fact made by State agency medical physicians and other consultants were taken into account. Those opinions were weighed as statements from non-– examining expert sources. Based on the evidence, the ALJ concluded that the State Agency adequately considered the evidence of record, however giving Grau the benefit of doubt, it was also reasonable to set forth a more restrictive residual functional capacity assessment which is supported by the objective medical evidence, the medical opinions when afforded appropriate weight, and Grau's subjective complaints during the relevant period when taken in proper context. The ALJ found, supported by all these factors, that limitations on Grau's capacities which were set forth in the decision were warranted, but no greater or additional limitations were justified.

6. Through September 30, 2009, Grau was capable of performing past relevant work as a Research Assistant II. That work did not require performance of work related activities precluded By Grau's residual functional capacity (20 CFR 404. 1565).

The ALJs conclusion was based on vocational expert testimony. He compared Grau's residual functional capacity with the physical and mental demands of that work and found that she was able to perform it is generally performed. The vocational expert's testimony was consistent with the information contained in the Dictionary of 0ccupational Titles (DOT) (Social Security Ruling 0 0 – 4p).

While the ALJ found that Grau was capable of performing past relevant work, he also found that there were other jobs existing in the national economy that she was also able to perform. As a result he made alternative findings for step five of the sequential evaluation process:

Grau was born on March 21, 1955, and was 54 years old, which is defined as an individual closely approaching advanced age on September 30, 2009 (20 CFR 404. 1563). On May 21, 2010, her age category changed to an individual closely approaching advanced age (20 CFR 404. 1563) which is not pertinent to the decision based on the date last insured. Grau had at least a high school education and was able to communicate in English (20 CFR 404.1564). Grau had acquired work skills from past relevant work (20 CFR 404.1568). Testimony from the vocational expert established that Grau had past relevant work as a research assistant II and was skilled with a specific vocational preparation (SVP) code of 6 and acquired skills of interviewing, gathering, analyzing and compiling data. Grau's past relevant work as a child welfare caseworker was also skilled with an (SVP) code of 7. She acquired skills including providing social work Services, evaluation needs, developing plans, knowledge of resources available, maintaining records, and completing reports. Alternatively, and considering Grau's age, education, work experience, and residual functional capacity, she had also acquired work skills from past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy. (20 CFR 404. 1569, 404. 1569 ( a) and 404. 1568 (d)).

The ALJ noted that the vocational expert was asked whether there were occupations that could be performed by an individual having the same age, education, past relevant work experience, and residual functional capacity as Grau had through September 30, 2009. The expert testified that representative occupations such an individual could perform included Complier, (DOT) 209. 387 – 014, sedentary, semi–skilled with an SVP of 4, representing 127 positions in Iowa and 18, 800 positions nationally; as well as the position of Checker II (DOT 209. 687 – 010, sedentary, semi-skilled with an SVP of 4, representing 140 positions in Iowa and 12, 600 positions nationally.

The ALJ found pursuant to SSR 00 – 4p, that the vocational expert's testimony was Consistent with the information contained in the Dictionary of Occupational Titles. He further found That although Grau had additional limitations which did not allow her to perform the full range of sedentary work, taking into consideration her age, education and transferable work skills, a finding of "not disabled" was appropriate pursuant to Medical – Vocational Rule 201. 15.

7. Grau was not under a disability, as defined in the Social Security Act at any time from March 31, 2008, the alleged onset date, through September 30, 2009, the last date she was insured (20 CFR 404. 1520 (f)).

## II. (A) COMMISSIONER'S MOTION TO DISMISS

On November 5, 2014 (Clerk's 20), the Commissioner filed its Motion to Dismiss the Complaint filed by Grau. She resisted that motion by filing her Response on November 21, 2013,

(Clerk's 21).

In her motion to dismiss the Commissioner argues pursuant to F. R. Civ. P. 12 (b) (6) and

Section 205 (g), of the Social Security Act, 42 U. S. C. §405 (g), that Grau failed to timely file her

A appeal from the Commissioner's final decision because she did not file her response within the

6 0 – day time period as required by statute. The Commissioner further argues that the Appeals

Council of the Social Security Administration denied Grau's Request for Review on January 25,

2013, which required Grau to file her complaint in this court on or before April 1, 2013.

Pursuant to the relevant statute, the Commissioner notes that there is a presumptive five-

Day period for delivery of mailed notices, and taking into account that presumption, the filing

By Grau on April 3, 2013 was untimely. In addition the Commissioner argues that because

The filing of a complaint is the exclusive remedy pursuant to §405 (g) there has been no showing

By Grau that there were extraordinary circumstances that would justify the extension of the 60 – day

time period. Turner v. Bowen 862 F. 2d 708 (8th Cir. 1988).

Grau's substantive argument in her Response is two-fold: first she states that she did not

Receive the notice from the Appeals Council until April 2, 2013 and that both her complaint and

her application to proceed in forma pauperis were filed on April 3, 2013. She notes also that the

Filing of the application to proceed in forma pauperis tolls the statute of limitations while it is

Pending.

For the reasons that will be set forth in the balance of this Report and Recommendation,

this Magistrate Judge respectfully recommends that the Commissioner's motion to dismiss should be denied.

## III. STANDARD OF REVIEW

The district court "will affirm the ALJ's findings if supported by substantial evidence On the record as a whole." Perkins v. Astrue, 648 F. 3d 892, 897 (8th Cir. 2011) (quoting Med haug v. Astrue, 578 F. 3d 805, 813 (8th Cir.2009)). "Substantial evidence 'is less than A preponderance, but enough that a reasonable mind might accept as adequate to support a Conclusion.'" Renstrom v. Astrue, 680 F. 3d 1057, 1063 (8thCir. 2012) (quoting Moore v.Astrue, 572 F.3d 520, 522 (8TH Cir.2009)).a court must look at "evidence that supports and detracts from The ALJs decision," but '"[I]f, after reviewing the record, the Court finds it is possible to draw two inconsistent positions from the evidence in one of those positions represents the ALJs Findings, the court must affirm the ALJs decision.'"Cuthrell. Astrue,702 F. 3d 1114, 1116 (8th Cir.2013)(quoting Perkins, 648 F.3d at 897). "Even if substantial evidence support a contrary substantial evidence." Randolph v. Barnhart, 386 F.3d 835, 839 (8th Cir. 2004) (citing Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004)).

> A court will not disturb denial of benefits as long as the ALJ's decision falls within the available zone of choices. An ALJ's decision is not outside the zone of choice simply because the [the court] might have reached a different conclusion had [it] been the initial finder of fact.

Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir.2011) (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir.2008)).

The Eighth Circuit Court of Appeals has filed recent decisions, which in part have bearing on the issues present in this case.

In Blackburn v. Colvin, 646 F.3d 853, 858 (8th Cir. 2014), the Court stated, *inter alia,* that

> "Substantial evidence is less than a preponderance of the evidence. Teague v.Astrue, 638 F.3d 611, 614 (8th Cir. 2011), but is such "relevant evidence as a reasonable mind would find adequate to support the Commissioner's conclusion," Davis v. Apfe;, 239 F.3d 962, 966 (8th Cir. 2001). We may not reverse merely because we would have decided differently, or because substantial evidence supports a contrary outcome. Id.

A treating physician's opinion is given controlling weight if it is well-suppotged by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. Whitman v. Colvin, WL 3896131, quoting Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005). In considering how much weight to give a treating physician's opinion, an ALJ must also consider the length of the treatment relationship and the frequency of exam-inations. Casey v. Astrue, 503 F. 3d 687, 692 (8th Cir. 2007).

The Court will defer to the ALJ's credibility findings, if they are supported by adequate reasons and substantial evidence. Turpin v. Colvin, 750 F.3d 989, 993 (8th Cir. 2014).

16.

# IV. DISCUSSION

The major defect in Grau's appeal in this case, in the opinion of this Magistrate Judge, is the total absence in the record of any medical opinion by any treating physician that Grau is in fact disabled and incapable of being employed for compensation. To be sure Grau has been very diligent and motivated to complain about a myriad of medical problems, from Lupus to Lyme's Disease, as well as fibromyalgia. To be accurate, she has been diagnosed with fibromyalgia, but despite all her self-diagnosis and insistence to treating physicians, there have never been any specific diagnoses by a physician that she does in fact have either Lupus or Lyme's Disease.

On August 20, 2011, Dr. Jay E. Brown, stated that he advised Grau that her records did not support a "pathology" that supported her contentions she was incapacitated and that exercise would be of great benefit to her. He reported that she did not take that suggestion well. See Exh 26 F, page 627.

In fact a review of Exhibits 1E, 2E and 3E pages 221-228, brings to consideration the extent to which Grau has used letters to her various treating physicians to essentially "lobby" them to support her own self-diagnoses. Those exhibits are generally single-spaced documents prepared by Grau, quoting medical conditions and symptoms she has found by researching medical texts and articles.

It appears that Grau's entreaties to her physicians covered a number of years. In Exh.17F, p. 472, Dr. Paul V. Babikian stated afer examining Grau on June 2, 2009, that

> At this juncture it is not clear to me how to establish any specific diagnosis for your symptoms when you are not willing to pursue any tests. Due to the complex nature of your symptoms and the various opinions you have gotten from various specialists in the past it is unlikely that I will be able to make a diagnosis for you that will be satisfactory to you based on the previous testing you have had so far.

On September 14, 2009, she saw Dr. Alan Braun, who noted in his report, Exh 18F, p.486, *inter alia,* that she "still had fibromyalgia" as well as an assortment of somewhat vague complaints which he was having a problem sorting out. He added that Grau had seen dermatologists and neurologists among others as well as a chronic pain specialist, and none of them had been able to "adequately piece together all her issues."

A Residual Functional Capacity Assessment was performed on January 11, 2010, by Dr. Jan Hunter. Exh 20F, pps. 554-565. That assessment found, *inter alia*, that Grau could occasionally lift/carry 20 lbs.; frequently lift/carry 10 lbs.; stand/walk with normal breaks app-roximately 6 hours out of a normal 8- hour day; unlimited push/pull.

Dr. Hunter noted, "The preponderance of all the evidence in this case supports the con-clusion that the claimant was capable of performing at the level outlined herein." Additionally it found that Grau could occasionally climb stairs, etc.; balance, stoop, kneel, crouch and crawl.

Dr. Hunter also stated that Grau had no visual limitations or manipulative limitations; no comm-unicative or environmental limitations. He gave no opinions that suggested or established that Grau was incapable of working.

A further evaluation by Dr. John May on May 14, 2010, Exh.22F,p. 568, noted that the report by Dr. Hunter of January 11, 2010, remained appropriate and was "affirmed as written". Dr. May found no worsening of conditions during the time period between the two evaluations.

Dr. Jeffrey Boyd evaluated Grau on May 23, 2011, Exh 24F, p.573, and in his opinion stated, *inter alia*, that while she ha chest discomfort, he was "pretty certain" it was not cardiac in nature; and that she also displayed palpitations, lightheadedness and lower extremity edema. He stated that Grau  was " doing well from a cardiac standpoint; not change anything."

A report dated June 21, 2011, Exh. 25F, p.588, by Dr. Alan Braun, stated that his impression was that Grau had fibromyalgia, but he was not convinced she had Lyme Disease; he continued to believe she had an undifferentiated connective disease, which was a viable diagnosis. It is also important to point out that during 2010, Grau saw Dr. Braun on at least three occasions, and nothing he observed or diagnosed in 2010, in any way established the basis for different diagnoses for Grau in 2011.

In addition, Dr. Adam Bell found on February 22, 2011, that the screen for Lupus-anticoagulant was normal. Exh 25F, p. 601. That same analysis was also negative for Lyme Disease.

Dr. Charles Gilarski evaluated Grau on September 10, 2011, Exh 26F, p. 612. She was complaining at that time about her plantar fasciitis problems, notwithstanding the fact she was not wearing orthotics that had been prescribed for her previously to help her overcome those problems. She also complained then about getting no exercise because of the problems with her feet, and walking problems.

Grau saw Dr. Jay Brown on April 20, 2011, Exh. 26F, pps. 627-628. She brought numerous medical records with her for him to read, he noted, and he "did his best" to reassure her that there really was not much in the way of evidence for the kind of pathology that should incapacitate her, and that regular , vigorous exercise "would be most helpful" and useful in helping normalize her life. He added to his notes that his suggestion "was not particularly well received."

Dr. Ricardo D. Arbulu Guerra, evaluated Grau on August 25, 2011, Exh 26F, p. 650. His entry on that date states that Grau was complaining of multiple somatic complaints that seemed "unrelated", with some of the complaints that seemed to be related to hypochondriac behavior. He noted that she had a diagnosis of unspecified connective tissue disorder for which she had medications.

Dr. Guerra observed in his notes that Grau had been evaluated by Dr. Gerbracht previously who noted that he did not believe Grau had any significant connective tissue disorder, an opinion which Dr. Guerra shared. After Dr. Guerra saw Grau on three different occasions he stated:

> This behavior of "doctor shopping", and "breaking up" with physicians when she is told different opinions, is classic hypochondriac behavior, possibly in borderline personalities. I think the most important step in her management is good psychiatric and psycho therapeutic follow up, which she refuses.

## V. CONCLUSION

The undersigned Magistrate Judge is of the opinion after reviewing the record in this case, the Decision by the Administrative Law Judge Tom L. Morris and the submissions by the parties that the ALJ did in fact properly and appropriately undertake the five-step sequential evaluation process in arriving at his decision. For the reasons stated, and the standard of review the Court must employ, this Magistrate Judge finds that substantial evidence supports the ALJ's conclusion that Barbara J. Grau is not disabled within the meaning of the Act and particularly his findings regarding Grau's credibility as set forth above. Accordingly this Magistrate Judge respectfully recommends that the Court affirm the Decision of the ALJ, and that the Clerk of Court be directed to enter judgment for the Defendant and against the Plaintiff.

The parties shall have 30 days from the filing of this Report and Recommendation to file any and all objections, motions or other pleadings directed to this Report and Recommendation in accordance and compliance with the requirements of 28 USC 636(a)(1), and the Local Rules of this Court.

**It is so ordered.**

Dated this 6th Day of April, 2015

THOMAS J. SHIELDS
RECALLED UNITED STATES MAGISTRATE JUDGE